# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **A.M.H.**, an individual, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 2:25-cv-472** |
| | ) |
| **BEST WESTERN INTERNATIONAL, INC.;** | ) |
| | ) |
| **COLUMBUS HOTEL INC.;** | ) **JUDGE ALGENON L. MARBLEY** |
| | ) |
| **RED ROOF INNS, INC.; RED ROOF FRANCHISING, LLC.;** | ) |
| | ) |
| **DJKS, INC.;** | ) **MAGISTRATE JUDGE ELIZABETH PRESTON DEAVERS** |
| | ) |
| **GAJANAND, LLC;** | ) |
| | ) |
| **G6 HOSPITALITY FRANCHISING, LLC; MOTEL 6 OPERATING LTD** | ) |
| | ) |
| **CHOICE HOTELS INTERNATIONAL, INC.,** | ) |
| | ) |
| **DIVYA JYOTI LTD;** | ) |
| | ) |
| **WYNDHAM HOTEL & RESORTS, INC.; WYNDHAM WORLDWIDE; WYNDHAM HOTEL GROUP, LLC;** | ) |
| | ) |
| **NORTHLAND HOTEL INC.** | ) |
| | ) |
| **Defendants.** | ) |

## <u>SECOND AMENDED COMPLAINT</u>

Pursuant to permission from this Court, ECF No. 151, Plaintiff substitutes Columbus Hotel, Inc.

for previously named Defendants Jui Lin and Ming Lin. The only changes are the case caption, document

title to Second Amended Complaint, and paragraphs 45 and 57.

COMES NOW, the Plaintiff ("Plaintiff" or "A.M.H"), pursuant to Federal Rule of Civil Procedure 15(a)(2), with written consent of Defendants, respectfully submits by and through her undersigned counsel, this amended complaint for damages and makes the following averments upon information and belief.

## INTRODUCTION

1. Plaintiff A.M.H is a survivor of human sex trafficking who was trafficked from approximately 2006 through 2017 in the Columbus Ohio area.

2. A.M.H. met someone as a social acquaintance who was paid by sex traffickers to introduce her to them. She was coerced and forced into sex trafficking for the next decade, being sold for sex in Defendants' hotel and motel rooms until approximately 2017.

3. A.M.H. was forced to consume drugs and alcohol and to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation in Defendants' hotel and motel rooms.

4. Plaintiff's traffickers rented hotel and motel rooms at Defendants' properties for one purpose—a location to engage in sex trafficking.

5. Plaintiff's traffickers forced her onto Defendants' properties where she was repeatedly raped and forced to perform commercial sex acts with "buyers" and "johns" under threats of physical and psychological abuse and threats to harm her and her family.

6. It was obvious to anyone at the Defendants' properties that A.M.H. was being forced to sell her body for sex. It was obvious to any Defendant that they were profiting from her sex trafficking through their monitoring of the properties.

7. At some point, A.M.H. was able to escape the grasps of her trafficker and the prison of Defendants' hotel and motel rooms.

2

8. A.M.H. brings this lawsuit to hold accountable Defendants who continued to profit from her obvious trafficking, facilitating it and harboring it, for their role in her trafficking.

## **OVERVIEW OF TRAFFICKING**

9. It has been known for decades in the hospitality industry that a significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

10. Sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their properties.

11. Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags.

12. Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

13. The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[1] However, traffickers are not the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts.

---

[1] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017),

3

https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.
Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims, including Plaintiff.

14. Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

15. The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

16. Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of Plaintiff on their properties.

17. Plaintiff, a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595. Each Defendant, knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

## PARTIES

18. Plaintiff is a natural person and a resident and citizen of Laurelville, Ohio.

19. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

4

a. Due to the sensitive and intimate nature of the issues, Plaintiff requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[2]

b. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[5]

c. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[5] Fed. R. Civ. P. 26(c).

d. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

e. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

20. **Defendant Choice Hotels International, Inc.** ("Choice") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Rockville, Queens and can be served through its registered agent, United States Corporation Company, at 3366 Riverside Dr. Suite 103 Upper Arlington, Ohio 43221.

21. Choice owns, supervises, manages, controls, and/or operates the Quality Inn & Suites located at 3950 Tuller Road, Dublin, OH 43017 ("Choice's Quality Inn & Suites Dublin" and/or "branded property") where Plaintiff was trafficked for sex from approximately 2006 through 2017.

a. Choice's Quality Inn & Suites Dublin is a Choice brand property.[7]

---

[6] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).
[7] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).Choice employees work throughout Choice's Quality Inn & Suites Dublin.

Choice employees work jobs including front desk and housekeeping. Choice is the principal with control over nearly every element of operations at Choice's Quality Inn & Suites Dublin. Choice is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including Choice's Quality Inn & Suites Dublin where Plaintiff was trafficked.[8] Choice has an actual and apparent agency relationship with the physical property owner of Choice's Quality Inn & Suites Dublin as to establish vicarious liability.

b. Choice controlled and dictated the actions and inactions of Choice's Quality Inn & Suites Dublin through highly specific and detailed brand standards, policies, and procedures.

c. Choice knowingly benefited, or received something of value, from its commercial business ventures at Choice's Quality Inn & Suites Dublin through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where Plaintiff was trafficked, as well as in maintaining a positive public image for the Choice brand.

d. Choice is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Choice has derived substantial revenue from services rendered in Ohio.

---

[8] See, e.g., *Revenue Management*, RED ROOF, https://www.redrooffranchising.com/revenue- management (last visited Jun. 9, 2022) (proclaiming "Our Team is an Extension of Yours").Whenever reference is made in this Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or

representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

22. **<u>Defendant Divya Jyoti LTD ("Choice Franchisee")</u>** is a limited liability company owned and operating under the laws of the State of Ohio. It can be served by its registered agent, Sanjay Bhatt Esq., located at 2929 Kenny Road, Suite 160, Columbus, OH 43221. Upon information and belief Choice Franchisee, managed and operated the Quality Inn & Suites Dublin.

23. **<u>Defendant Wyndham Hotel & Resorts, Inc.</u>** ("Wyndham Corporate") is a large hotel brand with nearly 9,000 branded properties worldwide. Wyndham Corporate is a Delaware for profit corporation with its principal place of business in Parsippany, New Jersey. Wyndham Corporate maintains a registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, Ohio 45202, through which it can be served.

24. Wyndham Corporate is the successor entity to **<u>Defendant Wyndham Worldwide Corporation</u>** ("Wyndham Worldwide") retains successor liability for the wrongful acts of its predecessor. Wyndham Corporate's 10k from 2022 states filing with the Securities and Exchange Commission ("SEC") in 2022

> We are one of the world's largest hospitality companies, offering travelers a wide range of hospitality services and products through our global portfolio of world-renowned brands. The hospitality industry is a major component of the travel industry, which is one of the largest retail industry segments of the global economy. Our portfolio of brands have a significant presence in many major hospitality markets in the United States and throughout the world and are uniquely positioned to provide travelers access to a large assortment of travel accommodations and destinations.

> Our brands include: Wyndham Hotels and Resorts, Ramada, Days Inn, Super 8, Howard Johnson, Wingate by Wyndham, Microtel Inns & Suites by Wyndham, TRYP by Wyndham, Dolce Hotels and Resorts, RCI, Landal GreenParks, Novasol, Hoseasons, cottages.com, James Villa Holidays, Wyndham Vacation Rentals, Wyndham Vacation Resorts, Shell Vacations Club and WorldMark by Wyndham

25. Defendant Wyndham Corporate's 10K filing with the SEC in 2022 states that Wyndham Corporate was spun off from Wyndham Worldwide, now known as Travel + Leisure Co., which was the former parent:

> Our business was initially incorporated as Hospitality Franchise Systems, Inc. in 1990 to acquire the Howard Johnson brand and the franchise rights to the Ramada brand in the United States. It was an integral part of Wyndham Worldwide Corporation and its predecessor from 1997 to 2018. Wyndham Hotels became an independent, public company in May 2018 when it was spun-off from Wyndham Worldwide, now known as Travel + Leisure Co. ("Travel + Leisure").

26. Wyndham Corporate maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, Ohio 45202.

27. **Defendant Wyndham Hotel Group, LLC** ("Wyndham Hotel Group"), upon information and belief, is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, Wyndham Hotel Group, LLC is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc. and a former subsidiary of Wyndham Worldwide Corporation. Wyndham Hotel Group may be served through its registered agent for service, Corporate Creations Network, Inc - 4000 Eagle Point Corporate Drive, Birmingham, AL 35242

28. Wyndham Corporate and Wyndham Hotel Group, are referred to collectively as the "Wyndham Defendants."

29. Upon information and belief, Wyndham owned, supervised, managed, controlled, and/or operated: 1078 E Dublin Granville Rd, Columbus, OH 43229 ("Wyndham's Super 8

Columbus" and/or "branded property") where A.M.H. was trafficked from approximately the 2006 through 2017.

    a. Wyndham's Super 8 Columbus is a Wyndham brand property.[9]

    b. Wyndham employees worked throughout Wyndham's Super 8 Columbus Wyndham employees worked jobs including front desk and housekeeping. Wyndham is the principal with control over nearly every element of operations at Wyndham's Super 8 Columbus. The Wyndham Defendants are liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including Wyndham's Super 8 Columbus where Plaintiff was trafficked. The Wyndham Defendants have an actual and apparent agency relationship with the physical property owners of Wyndham's Super 8 Columbus as to establish vicarious liability.

    c. The Wyndham Defendants controlled and dictated the actions and inactions of Wyndham's Super 8 Columbus through highly specific and detailed brand standards, policies, and procedures.

    d. The Wyndham Defendants knowingly benefited, or received something of value, from its ventures at Wyndham's Super 8 Columbus through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where A.M.H. was trafficked, as well as in maintaining a positive public image for Wyndham's Super 8

---

[9] *Our Brands,* Wyndham Hotels, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited September 27, 2022).

Columbus. Wyndham also benefited from gathering personal data from the Wi-Fi it provided to customers including Plaintiff and her trafficker.

e. The Wyndham Defendants are subject to the jurisdiction of this Court because they regularly conduct business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. The Wyndham Defendants have derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that the Wyndham Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham.

30. **Defendant Northland Hotel Inc. ("Wyndham Franchisee")** is a corporation for-profit owned and operating under the laws of the State of Ohio. It can be served by its registered agent, Joseph L. Piccin, Esq., located at 3010 Hayden Road, Columbus, OH 43245. Upon information and belief Wyndham Franchisee managed and operated the Wyndham Super

31. **Defendant Red Roof Inns, Inc.** ("Red Roof Inns"). is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through **Defendant Red Roof Franchising, LLC**, ("Red Roof Franchising") (together Red Roof Inns and Red Roof Franchising will be referred to as "Red Roof").[10] Red Roof purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United

---

[10] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm.

States. Red Roof serves customers throughout the United States and other countries throughout the World.

32. Red Roof is a global hotel brand with approximately 650 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

33. Red Roof maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103 Upper Arlington, Ohio 43221.

34. Red Roof Franchising was named one of the fastest growing franchises in 2017. It is a Delaware limited liability company with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

35. Red Roof Franchising maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, OH 43221.

36. Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn located at 1221 E Dublin Granville Rd, Columbus, OH 43229 ("Red Roof's Red Roof Inn Columbus" or "branded property").

   a. Red Roof's Red Roof Inn Columbus is a Red Roof Inn branded property.[11]

   b. Red Roof employees work throughout the Red Roof Inn Columbus. Red Roof employees work jobs including front desk and housekeeping. Red Roof is the principal with control over nearly every element of operations at the Red Roof Inn Columbus. Red Roof is liable, either directly, vicariously, or indirectly

---

[11] *Our Brands*, RED ROOF, https://www.redrooffranchising.com (last visited Jun. 9, 2022); *Red Roof Inn*, RED ROOF, https://www.redrooffranchising.com/red-roof-inn (last visited Jun. 9, 2022).

through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Red Roof Inn Columbus where Plaintiff was trafficked. Red Roof has an actual and apparent agency relationship with the physical property owner of the Red Roof Inn Columbus as to establish vicarious liability.

c. Red Roof controlled and dictated the actions and inactions of the Red Roof Inn Columbus through highly specific and detailed brand standards, policies, and procedures.

d. Red Roof knowingly benefited, or received something of value, from its ventures at the Red Roof Inn Columbus through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where Plaintiff was trafficked, as well as maintaining a positive public image for the Red Roof Inn brand. Red Roof also benefited from gathering personal data from the Wi-Fi it provided to customers including Plaintiff and her trafficker.

e. Red Roof is subject to the jurisdiction of this Court because its corporate offices are headquartered in this district. In addition, Red Roof regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Red Roof has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or

representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Red Roof.

37. **Defendant DJKS, Inc ("DJKS")** is an incorporation who is organized and operating under the laws of the State of Ohio. DJKS can be served by its registered agent, Naresh Patel at 600 Enterprise Drive, Lewis Center, OH 43035.

38. **Defendant Gajanand, LLC ("Gajanand")** is a limited liability company who is organized and operating under the laws of the State of Ohio. Gajanand can be served by its registered agent, Sachin Patel located at 6480 Park Pointe Court, Pepper Pike, OH 44124.

39. A.M.H.'s claims arise out of Red Roof's actual and apparent agency relationship with their branded hotels, including Columbus RRI, where A.M.H. was trafficked. Red Roof is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at their branded hotels, including Columbus RRI. Red Roof's participation in a venture with their branded properties, including Columbus RRI, occurred, in substantial part, in Ohio because:

    a. Upon information and belief, Red Roof's branded properties actively sought out a franchising relationship by contacting Defendants in Ohio.

    b. Red Roof's branded properties acknowledged that the execution and acceptance of the franchising agreement occurred in the Southern District of Ohio.

    c. The franchising agreement had a choice of law provision selecting the law of Ohio as the governing law.

d. The franchising agreement required that Red Roof's branded properties irrevocably submit themselves to the jurisdiction of Ohio courts and waived all objections to personal jurisdiction and service of process.

e. The franchising agreement required Red Roof's branded properties to report information to the Red Roof in Ohio, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve, Columbus RRI, including those involving sex trafficking victims.

f. Red Roof's branded properties agreed to submit all notices required under the franchising agreement to Defendants in the Southern District of Ohio.

g. Red Roof's branded properties were required to attend training and meetings in Ohio.

h. Red Roof dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects from their principal place of business in the Southern District of Ohio.

i. Red Roof's branded properties had an ongoing obligation to participate in centralized programs operated by Defendants from their principal place of business in the Southern District of Ohio.

j. Upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by Red Roof from their principal place of business in Ohio.

k. Upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by Red Roof in Ohio.

l. The benefit that Red Roof's branded properties received from room rentals was governed by the Ohio franchising agreement.

m. Red Roof's branded properties agreed to make all payments due under the franchising agreement at Red Roof's principal place of business in the Southern District of Ohio.

n. Red Roof's operation of Columbus RRI was controlled and/or influenced by many policies set and enforced by Defendants from their principal place of business in Ohio. Including those policies specifically related to prostitution, commercial sex, human and sex trafficking.

40. Furthermore, Defendants benefited from their operations at Columbus RRI in more ways than just through royalty payments, licensing fees, and room revenue. Defendants gathered personal data from the internet / Wi-Fi services it provided to guests, including but not limited to A.M.H., her trafficker, and those "johns" who paid money to engage in sexual activity. This data collection provided further value to Defendants, enhancing their ability to market and promote their services while maintaining and promoting a positive public image for their brand.Whenever reference is made in this Complaint to any act, deed, or conduct of Defendants, the allegation is that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Columbus RRI, where A.M.H. was trafficked.

41. Upon information and belief, **<u>Defendant G6 Hospitality, LLC.</u>** ("G6") is a large

hotel brand with over 1,400 branded properties worldwide. It is a Delaware limited liability company with its principal place of business in Carrollton, TX and can be served through its registered agent, Corporation Service Company at 50 W. Broad Street, Suite 1330, Columbus, OH 43215.

42. G6 owned, supervised, and/or operated the non-franchised Motel 6 located at 1289 E Dublin Granville Road, Columbus, OH 43229 ("G6's Motel 6 Columbus North" and/or "branded property").

    a. G6's Motel 6 Columbus North is a non-franchised G6 brand property.[12]

    b. G6 employees worked throughout G6's Motel 6 Columbus North. G6 employees worked jobs including front desk and housekeeping. G6 is the principal with control over nearly every element of operations at G6's Motel 6 Columbus North. G6 is liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including G6's Motel 6 Columbus North where Plaintiff was trafficked. G6 has an actual and apparent agency relationship with the physical property owners of G6's Motel 6 Columbus North as to establish vicarious liability.

    c. G6 controlled and dictated the actions and inactions of G6's Motel 6 Columbus North through highly specific and detailed brand standards, policies, and procedures.

    d. G6 knowingly benefited, or received something of value, from its ventures at G6's Motel 6 Columbus North through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations,

[12] *Our Brands,* Wyndham Hotels, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited September 27, 2022).

including rates charged through rooms where Plaintiff was trafficked, as well as in maintaining a positive public image for G6's Motel 6 Columbus North.

e. G6 is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. G6 has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of G6, the allegation is that G6 engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of G6.

43. **<u>Defendant Motel 6 Operating LTD ("Motel 6 Operating")</u>** is a foreign limited partnership owned and operated under the laws of the State of Ohio. It can be served by its registered agent, Cogency Global Inc., located at 3958-D Brown Park Drive, Hilliard, OH 43026. Upon information and belief, Motel 6 Operating is a subsidiary of the G6 Brand Defendant.

44. **<u>Defendant Best Western International, Inc.</u>** ("Best Western") is a large hotel brand with over 4,700 branded properties worldwide. It is an Arizona corporation with its principal place of business in Phoenix, AZ and can be served through its registered agent, The Prentice-Hall Corporation System, Inc., at 50 W. Broad Street, Suite 1330, Columbus, OH 43215.Best Western owned, supervised, and/or operated the Best Western® that was located at 888 Dublin Granville Road, Columbus, OH 43229 ("Best Western's Best Western Plus Columbus" and/or "branded property")

18

a. Best Western's Best Western Plus Columbus is a Best Western branded property.[13]

b. Best Western employees work throughout Best Western's Best Western Plus Columbus. Best Western employees work jobs including front desk and housekeeping. Best Western is the principal with control over nearly every element of operations at Best Western's Best Western Plus Columbus. Best Western is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including Best Western's Best Western Plus Columbus where Plaintiff was trafficked. Best Western has an actual and apparent agency relationship with the physical property owner of Best Western's Best Western Plus Columbus as to establish vicarious liability.

c. Best Western controlled and dictated the actions and inactions of Best Western's Best Western Plus Columbus through highly specific and detailed brand standards, policies, and procedures.

d. Best Western knowingly benefited, or received something of value, from its ventures at Best Western's Best Western Plus Columbus through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where Plaintiff was trafficked, as well as maintaining a positive public image for the Best Western brand.

---

[13] *Our Brands*, RED ROOF, https://www.redrooffranchising.com (last visited Jun. 9, 2022); *Red Roof Inn*, RED ROOF, https://www.redrooffranchising.com/red-roof-inn (last visited Jun. 9, 2022).Best Western is subject to

the jurisdiction of this Court because its corporate offices are headquartered in this district. In addition, Best Western regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Best Western has derived substantial revenue from services rendered in Ohio.

      e.    Whenever reference is made in this Complaint to any act, deed, or conduct of

Best Western, the allegation is that Best Western engaged in the act, deed, or

conduct by or through one or more of their officers, directors, agents, employees,

or representatives who was actively engaged in the management, direction,

control, or transaction of the ordinary business and affairs of Best Western.

45.      **<u>Defendant Columbus Hotel Inc. ("Best Western Franchisees Columbus Hotel")</u>**

Columbus Hotel managed and operated the Best Western Plus Columbus at 888 E. Dublin-

Granville Road, Columbus Ohio, 43229. They can be served at 4829 Stonehaven Drive,

Columbus, OH 43220.

## <u>JURISDICTION AND VENUE</u>

46.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

47.      The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA").

48.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants Choice and Wyndham.

49.      Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants Red Roof Inns, Inc. Red Roof Franchising, LLC, DJKS LLC, and Gajanand LLC have their principal place of business within this District.

50.      Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to the sex trafficking cases currently pending before Judge Algenon L. Marbley.

51.     Plaintiff's claims against the Choice Franchisee arise out of the Franchisee's contacts through the Franchisee's relationship with Choice Defendant. The Franchisee's participation in a venture with Choice Defendant operating the Quality Inn & Suites Dublin occurred, all upon information and belief:

a. The franchising agreement required Franchisee to report information to the Choice Defendant, including information about all incidents involving safety, security, public relations, or serious injury to person or property that occur at, or involve, the subject motel, including those involving sex trafficking victims.

b. The Choice Defendant dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects from their principal place of business.

c. The Franchisee had an ongoing obligation to participate in centralized programs operated by the Choice Defendant from their principal place of business.

d. Reservation information for rooms at the Quality Inn & Suites Dublin passed through a system operated and managed by the Choice Defendant.

e. Payment information for rooms at the Quality Inn & Suites Dublin passed through a system operated and managed by the Choice Defendant.

f. The Franchisee's operation of the subject Quality Inn & Suites Dublin was

controlled and/or influenced by many policies set and enforced by the Choice Defendant, including those policies specifically related to prostitution, commercial sex, and human and sex trafficking.

52. Defendants were corporate affiliates who participated in a joint venture with the Choice Defendant, and parties to franchising agreements and management agreements with the Choice Defendant, thereby operating the franchised property.

53. Plaintiff's claims against the Wyndham Franchisee arise out of the Franchisee's contacts through the Franchisee's relationship with Wyndham Defendant. The Franchisee's participation in a venture with Wyndham Defendant operating the Wyndham Super 8 occurred, all upon information and belief:

a. The franchising agreement required Franchisee to report information to the Wyndham Defendant, including information about all incidents involving safety, security, public relations, or serious injury to person or property that occur at, or involve, the subject motel, including those involving sex trafficking victims.

b. The Wyndham Defendant dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects from their principal place of business.

c. The Franchisee had an ongoing obligation to participate in centralized programs operated by the Wyndham Defendant from their principal place of business.

d. Reservation information for rooms at the Wyndham Super 8 passed through a system operated and managed by the Wyndham Defendant.

e. Payment information for rooms at the Wyndham Super 8 passed through a system operated and managed by the Wyndham Defendant.

f. The Franchisee's operation of the subject Fresno Super 8 was controlled and/or influenced by many policies set and enforced by the Wyndham Defendant, including those policies specifically related to prostitution, commercial sex, and human and sex trafficking.

54. Defendants were corporate affiliates who participated in a joint venture with the Wyndham Defendant, and parties to franchising agreements and management agreements with the Wyndham Defendant, thereby operating the franchised property.

55. Plaintiff's claims against DJKS arise out of DJKS' contacts with the Southern District of Ohio through DJKS' relationship with RRI and / or RRF, which have their principal place of business in the Southern District of Ohio. DJKS' participation in a joint venture with RRI Defendants operating Columbus RRI occurred, in substantial part, in Ohio because:

a. DJKS actively sought out a franchising relationship by contacting RRI and / or RRF in Ohio.

b. DJKS acknowledged that the negotiation, execution, and acceptance of the franchising agreement occurred in the Southern District of Ohio.

c. DJKS agreed that its ongoing performance of the franchising agreement would take place, in part, in the Southern District of Ohio.

d. The franchising agreement had a choice of law provision selecting the law of Ohio as the governing law.

e. The franchising agreement required DJKS to report information to RRI and / or RRF in Ohio, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve Columbus RRI, including those involving sex trafficking victims like A.M.H.

f. DJKS agreed to submit all notices required under the franchising agreement to RRI and / or RRF in the Southern District of Ohio.

g. DJKS was required to attend training and meetings in Ohio.

h. RRI and / or RRF dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects from their principal place of business in the Southern District of Ohio.

i. DJKS had an ongoing obligation to participate in centralized programs operated by RRI and / or RRF from their principal place of business in the Southern District of Ohio.

j. DJKS was required to purchase insurance on behalf of one or more Ohio entities (Red Roof).

k. Reservation information for rooms at Columbus RRI passed through a system operated and managed by RRI and / or RRF from its principal place of business in Ohio.

l. Payment information for rooms at Columbus RRI passed through a system operated and managed by RRI and / or RRF in the Southern District of Ohio.

m. The benefit that DJKS received from room rentals was governed by the Ohio franchising agreement.

n. DJKS agreed to make all payments due under the franchising agreement at RRI and / or RRF's principal place of business in the Southern District of Ohio.

o. DJKS' operation of RRI and / or RRF was controlled and/or influenced by many policies set and enforced by RRI and / or RRF from their principal place of business in Ohio.

p. DJKS signed a software licensing agreement with RRI and / or RRF for the property management software RRI and / or RRF required DJKS to use when operating Columbus RRI, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms. DJKS agreed to file any lawsuit arising from the licensing agreement in the Southern District of Ohio and waived personal jurisdiction and venue objections.

56. Plaintiff's claims against Gajanand, LLC arise out of Gajanand's contacts with the Southern District of Ohio through Gajanand's relationship with RRI and / or RRF, which have their principal place of business in the Southern District of Ohio. Gajanand's participation in a joint venture with RRI Defendants operating Columbus RRI occurred, in substantial part, in Ohio because:

a. Gajanand actively sought out a franchising relationship by contacting RRI and / or RRF in Ohio.

b. Gajanand acknowledged that the negotiation, execution, and acceptance of the franchising agreement occurred in the Southern District of Ohio.

c. Gajanand agreed that its ongoing performance of the franchising agreement would take place, in part, in the Southern District of Ohio.

d. The franchising agreement had a choice of law provision selecting the law of Ohio as the governing law.

e. The franchising agreement required Gajanand to report information to RRI and / or RRF in Ohio, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or

involve Columbus RRI, including those involving sex trafficking victims like A.M.H.

f. Gajanand agreed to submit all notices required under the franchising agreement to RRI and / or RRF in the Southern District of Ohio.

g. Gajanand was required to attend training and meetings in Ohio.

h. RRI and / or RRF dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects from their principal place of business in the Southern District of Ohio.

i. Gajanand had an ongoing obligation to participate in centralized programs operated by RRI and / or RRF from their principal place of business in the Southern District of Ohio.

j. Gajanand was required to purchase insurance on behalf of one or more Ohio entities (Red Roof).

k. Reservation information for rooms at Columbus RRI passed through a system operated and managed by RRI and / or RRF from its principal place of business in Ohio.

l. Payment information for rooms at Columbus RRI passed through a system operated and managed by RRI and / or RRF in the Southern District of Ohio.

m. The benefit that Gajanand received from room rentals was governed by the Ohio franchising agreement.

n. Gajanand agreed to make all payments due under the franchising agreement at RRI and / or RRF's principal place of business in the Southern District of Ohio.

o. Gajanand's operation of RRI and / or RRF was controlled and/or influenced by many policies set and enforced by RRI and / or RRF from their principal place of business in Ohio.

p. Gajanand signed a software licensing agreement with RRI and / or RRF for the property management software RRI and / or RRF required Gajanand to use when operating Columbus RRI, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms. Gajanand agreed to file any lawsuit arising from the licensing agreement in the Southern District of Ohio and waived personal jurisdiction and venue objections.

57. Plaintiff's claims against the Best Western Franchisee Columbus Hotel arise out of the Franchisee's contacts through the Franchisee's relationship with Best Western Defendant. The Franchisee's participation in a venture with Best Western Defendant operating the Best Western Plus Columbus occurred, all upon information and belief:

a. The franchising agreement required Franchisee to report information to the Best Western Defendant, including information about all incidents involving safety, security, public relations, or serious injury to person or property that occur at, or involve, the subject motel, including those involving sex trafficking victims.

b. The Best Western Defendant dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects from their principal place of business.

c. The Franchisee had an ongoing obligation to participate in centralized programs operated by the Best Western Defendant from their principal place of business.

d. Reservation information for rooms at the Best Western Plus Columbus passed

through a system operated and managed by the Best Western Defendant.

e. Payment information for rooms at the Best Western Plus Columbus passed through a system operated and managed by the Best Western Defendant.

f. The Franchisee's operation of the subject Best Western Plus Columbus was controlled and/or influenced by many policies set and enforced by the Best Western Defendant, including those policies specifically related to prostitution, commercial sex, and human and sex trafficking.

58. Defendants were corporate affiliates who participated in a joint venture with the Best Western Defendant, and parties to franchising agreements and management agreements with the Best Western Defendant, thereby operating the franchised property.

**<u>BACKGROUND</u>**

INTRODUCTION

59. Plaintiff brings her claims against the Hotel Defendants for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

60. The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

61. An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[14] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the

---

[14] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

62. As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties. Furthermore, Defendants, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

63. Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish a mandatory and secure reporting mechanisms at the point of sale.

64. With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like Plaintiff to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

65. Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

66. Defendants are jointly and severally liable for the Plaintiff's damages in this case.

**THE SEX TRAFFICKING OF PLAINTIFF**

67. Plaintiff met someone as a social acquaintance who was paid by sex traffickers to introduce her to them. Plaintiff was then taken captive by her traffickers and sold for sex in Defendants' hotel and motel rooms.

68.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, Plaintiff was held captive and sold for sex by her trafficker from approximately 2006 to approximately 2017.

69.     During the time that she was trafficked, Plaintiff's trafficker frequently rented rooms at the Defendants' hotel and motel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" to pay to engage in sex with Plaintiff

70.     Throughout her trafficking, Plaintiff's trafficker connected with "johns" by posting or causing to be posted advertisements on Backpage advertising for Plaintiff's availability for commercial sex under the aliases Kyla and Tess. Plaintiff's trafficker posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

71.     Plaintiff was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

72.     While under the coercive control of trafficker, Plaintiff's was imprisoned in hotel rooms rented by her trafficker and forced her to have sex for money. During that time, Plaintiff was trafficking in the following hotels:

    a.   Choice's Quality Inn & Suites Dublin;

    b.   Wyndham's Super 8 Columbus;

    c.   Red Roof's Red Roof Inn Columbus

    d.   G6's Motel 6 Columbus North;

    e.   Best Western's Best Western Plus Columbus

73.     Plaintiff's traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels, *i.e.*, Defendants' branded properties, repeatedly at intervals.

74.     While at the Defendants' branded properties, Plaintiff's traffickers violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape. Her deterioration and poor health conditions, her desperation was obvious to anyone who saw her.

75.     During her captivity at Defendants' branded properties, Plaintiff was raped, continuously abused physically and verbally, malnourished, psychologically tormented, drugged, and imprisoned.

76.     At the Defendant's branded properties, Plaintiff encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of Plaintiff's deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties as well as signs of malnutrition and poor health.

77.     Every time Plaintiff interacted with Defendants' staff, it was readily apparent that Plaintiff was under the control of her trafficker or traffickers. Plaintiff's traffickers often checked in to these properties by either using their own names or using other people to check in for them.

78.     Plaintiff's traffickers followed a repetitive and routine procedure during stays at the Defendants' branded properties and Defendants' knew or should have known of Plaintiff's trafficking because of a variety of factors detailed below.

Plaintiff was trafficked for sex at Choice's Quality Inn & Suites Dublin.

a. Plaintiff was sold for sex at Choice's Quality Inn & Suites Dublin between approximately 2006 to 2017.

b. Upon information and belief, Plaintiff's trafficker was known to staff at Choice's Quality Inn & Suites Columbus and even purchased drugs from Plaintiff's trafficker. On more than one occasion, Plaintiff was forced to have sex with the manager at this property in exchange for free and/or discounted rooms.

79. Plaintiff was subjected to sex trafficking at Wyndham's Super 8 Columbus.

80. Plaintiff was sold for sex at Wyndham's Super 8 Columbus from between approximately 2006 to 2017, occasionally staying for days at a time, within this period.

81. During multiple stays at Wyndham's Super 8 Columbus, the staff observed a lot of foot traffic of "johns" coming in and out of the hotel room. As a result, the staff placed Plaintiff's trafficker on Do-Not-Rent (DNR) list. However, Plaintiff and her trafficker were still allowed to return to Wyndham's Super 8 Columbus to rent rooms.

82. The trafficker was still seen in public areas of Wyndham's Super 8 Columbus during the stays when he was on the DNR list.

83. Plaintiff was subjected to sex trafficking at Red Roof's Red Roof Inn Columbus.

84. Plaintiff was sold for sex at the Red Roof's Red Roof Inn Columbus from between approximately 2006 to 2017.

85. Plaintiff was subjected to sex trafficking at G6's Motel 6 Columbus North.

86. Plaintiff was sold for sex at G6's Motel 6 Columbus North from between approximately 2006 to 2017.

87. On one occasion, Plaintiff witnessed a death at G6's Motel 6 Columbus North when she saw a woman being taken away by EMS on a stretcher covered up with a white sheet. On various other occasions, Plaintiff witnessed overdoses at G6's Motel 6 Columbus North that resulted in EMS being called to the property.

88.     Plaintiff was subjected to sex trafficking at and Best Western's Best Western Plus Columbus.

89.     Plaintiff was sold for sex at Best Western's Best Western Plus Columbus from between approximately 2006 through approximately 2017.

90.     During multiple stays at Best Western's Best Western Plus Columbus, the staff observed a lot of foot traffic of "johns" coming in and out of the hotel room. As a result, the staff placed Plaintiff's trafficker on Do-Not-Rent (DNR) list. However, Plaintiff and her trafficker were still allowed to return to Best Western's Best Western Plus Columbus to rent rooms.

91.     Plaintiff's trafficker was still seen in public areas of Best Western's Best Western Plus Columbus during the stays when he was on the DNR list.

92.     At all Defendants' branded properties there was constant foot traffic in and out of Plaintiff's room. At all hours of the day and the night, the staff witnessed "johns" come into the main entrance and to Plaintiff's room. The staff also had access to security camera footage documenting the constant stream of buyers from cameras placed in throughout the hotel.

93.     At all Defendants' branded properties Plaintiff's trafficker was very violent with her and loud sounds of abuse could often be heard from the room.

94.     Each stay at Defendants' branded properties where Plaintiff was trafficked resulted in several consistent red flags, including, but not limited to: Paying for extended stays on a day-by-day basis; Requesting a room away from other quests; Obvious signs of illegal drug use; Physical abuse in public spaces; Women wearing clothing inappropriate for the weather; Unusually large number of male visitors coming in and out of the room; Loud noises of abuse or other emergency audible to staff or other rooms; and Living out of the hotel room.

95.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at Defendants' branded properties.

96.     The red flags were open and obvious to anyone working at Defendants' branded properties.

## DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS

97.     Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[15] The United Nations,[16] international non-profits,[17] and the U.S. Department of Homeland Security,[18] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

98.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States,

---

[15] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[16] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[17] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[18] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and

Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

99.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[19] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[20] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

100.    The Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

---

[19] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heino us%20crime.
[20] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

101.    The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

102.     The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

103.     A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**CHOICE**

104.     Regarding a stay in March 2013 at Choice's Quality Inn & Suites Dublin, a hotel customer wrote a review saying, "Bottom line: I am the mother of the previous reviewer, Kate, and in my 61 yrs.of a life of travel I have never had such a terrifying experience due to the deranged actions of one of this motel's employees (who seems to be in charge at the front desk- a middle aged man, will not use his name.). Just after midnight he tried violently to break into our room after midnight, continuing to try to break our security lock, even though my daughter and I were screaming for him to go away and pushing against the door to keep him out. He kept yelling that we had checked out but: 1.He had been at the desk when my daughter had paid for the room that very afternoon, 2. The room had not been cleaned (it hadn't all week that we had been there), our things were all still there. 3. Our card key will worked (they disable them when you check out). 4. We had entered the motel and walked past the front desk 2 hrs earlier and no-one stopped us asking if we had paid. We had no indication that they thought we did not belong in the room. Also: 1. All of our MALE relatives who had been staying in the 2 rooms next to us had left that day- we were two women alone. 2. This man did NOT KNOCK 3. He DID NOT at anytime identify himself as a motel employee. Kate recognized him when she ran to try to push the door closed and saw him through the opening- as the older man who runs the desk and whom

36

she and my brother-in-law had seen push a female employee in anger earlier. We were terrified!!!We had to call the police and have them escort us safely out, We are working with the police now. Further, we have contacted the Quality in home office and have received no response. I'll post updates."

105.    Regarding a stay in May 2016 at Choice's Quality Inn & Suites Dublin, a hotel customer wrote a review saying, This hotel is the worst hotel ever. We arrived for a early check in and the front desk lady was really rude and the room smelled like cigarettes really bad and they didn't do nothing about it and then while I was laying down for the night I got bit by a bug and that was it for us, we left as soon as that happened and nothing was done about that. I asked for my refund and the manager was very rude about it. I'll never stay here again and I don't refer anyone to stay here. The outside looks amazing till u enter the door."

**WYNDHAM**

106.    Regarding a stay in June 2014 at Wyndham's Super 8 Columbus, a hotel customer wrote a review saying, "I am holed up in this room right now so thankful I purchased a new AK47 on this trip and have plenty of ammo. WE got to the hotel just in time for the police to swoop in with several cars to arrest some one - this did not seem to disturb the prostitutes one bit. Perhaps they have developed their great work ethic from their ever present pimps who I believe are flying the colors of the Crips. (Mind you I am not an expert) This is the first hotel I have ever stayed at that has security bars on the snack machine. As for the room I checked and did not findany used condoms - needles or bullet holes so I guess that is a plus. The bed has a plastic drop cloth under the sheets so that should be nice and sanitary. Hopefully we will live the night but things seem dicey right now. If you do decide to stay at this property I suggest investing in a good bullet proof vest and be certain to carry a battle rifle and appropriate side arm. And pray - PRAY A LOT!"

107.    Regarding a stay in July 2013 at Wyndham's Super 8 Columbus, a hotel customer

wrote a review saying, "The room and service were great. But I was very dissapointed to find the lock at entrance door C was not working. Also I didn,t like the hookers and pimps continusally hanging around the parking area and sitting at entrance door C. Otherwise I would give the hotel a great rating.."

108.    Regarding a stay in April 2022 at Wyndham's Super 8 Columbus, a hotel customer wrote a review saying, "Worst place I've ever stayed drug deals going on a man going in a hookers room middle of day dirty tv broken smelled of weed people loitering outside scary all around DO NOT STAY HERE wish I could get money back"

109.    Regarding a stay in June 2014 at Wyndham's Super 8 Columbus, a hotel customer wrote a review saying, "Today we were evicted from the hotel by the police due to the drug/prostitution ring being ran out if it. Not to mention that Day 1 of our Day 2 stay we had no power from 2:30 until well after we lest at 9:00 for our zoo visit. The best part was the 3 lovely front desk workers refused to offer us a refund. Stating that they had not yet been paid by Expedia and could not give us our refund. But they were nice enough to give us Expedias customer service number who also could not offer our refund and referred us back to the hotel. The carpets were stained the linens were old and the bathroom had enough Clorox residue to

cover the evidence of the best crime scene. But if hookers and smack are your thing, by all means. But do not expect them to leave the light on. They most likely will not have power."

**RED ROOF**

110.    Regarding a July 2018 stay at Red Roof's Red Roof Inn Columbus, a hotel customer wrote a review saying, "I gave this hotel a 1 because I couldn't give it lower. The front desk lady warranted a four but then it ended. Worst hotel I have ever stayed in. Filthy, things falling apart, baseboards coming off wall. People drinking in back in paper bags and loitering in front in groups. Not good neighborhood. Didn't eat breakfast as place too dirty. Slept in my socks and washed the clothes we wore the next day. If was travelling alone I would have left."

111.    Regarding a October 2021 stay at Red Roof's Red Roof Inn Columbus, a hotel customer wrote a review saying, "Do not stay here. We should've known when we pulled up and cops were circling the parking lot. We check in and head to our room and there's a guy tweaking in the hallway. The whole place reeks of weed. The rooms are sooooo gross. Then I saw another guy outside in the trashed parking lot who was on something and a van pulled up next to him, a guy got out of the back and punched him straight in the face and he fell to the ground, got up and the van and the guy followed him until I couldn't see anymore. Not a safe or clean place AT ALL."

**G6**

112.    During a stay in July 2016 at G6's Motel 6 Columbus North, a hotel customer wrote a review saying, "I have never stayed in a bigger dive. Inexcusably filthy. Lacking almost all amenities. It was clearly shown that it has not been taken care of or properly cleaned. We had a nonsmoking room but yet the toilet seat had burn marks and stains from cigarettes. The tile in the bathroom and the carpet both had a lot of hairs and were so dirty that I didn't feel like I could

take off my shoes. Shower tile was crumbling and the paint in the room was chipped off around the edges. Carpet in the hallway was deplorable and a trip hazard. In oder to get ice you have to go up to the third floor in a rickety elevator filled with trash. When you got up to the third floor it was about 95 degrees and the condition was even cringier than the first floor. Would never ever recommend or stay again."

113. Authorities rescued a woman after reports of screams for help resulted in police being called to a Sunnyvale, CA, Motel 6 in January of 2021. Three individuals were arrested on human trafficking charges as they fled the hotel.

114. One guest described their time at a Springfield, VA, Motel 6 by stating, "You name it, you don't get in this motel. What you do get is hallways smelling like marijoana and other illegall drugs. prostitutes renting rooms, drug dealers hanging around the motel, etc. I can't believe that fairfax county police are not aware of these activities. Stay away from this motel if you don't like to expose yourself and your family to such activities mentioned above…"

115. Regarding an August 2012 stay at a Dayton, OH, Motel 6 one customer said, "Fat woman walking around outside asking everyone if they want company. She then goes in the office so it's ok with them…"

116. At a Nashville, TN, Motel 6, two people were arrested on trafficking charges. The victim said that two individuals forced her to have sex with strangers for money and they would hit and threaten her if she would not comply.

117. A reviewer wrote of their February 2013 stay at a Mansfield, OH, Motel 6: "the next-door people was loud, nasty, cars coming and going and drugs and prostitution going on…"

118. Regarding a June 2017 stay at Best Western's Best Western Columbus, one customer said, "Was in town for a wedding and meant to book Port Columbus and got this hotel instead. The was definitely the worst hotel I have ever stayed in. There were drug dealers, hookers and homeless people hanging around; empty **condom** boxes outside and a dog pooped in the hall and it was not cleaned until at least 24 hours later and only after we called to complain. The electricity went out Friday morning, I was woken up to the microwave beeping and I could not move the entertainment center to unplug it. I called the lobby and they said they would send someone up to unplug it but never did. There were gnats in the room and even though I kept killing them, they somehow continued to reappear...I would not stay here for free!"

119. Regarding a February 2016 stay at Best Western's Best Western Columbus, one customer said, "First thing I'd like to say is. Our room was clean. Now for the rest of the hotel. From the minute we walked to our room we smelled a very strong marijuana smell and the hallways stayed that way during the two night stay. The bar area was dirty and we waited a very long time to make an order. After ordering our drinks we were ignored and didn't receive a drink until we saw another employee who had no idea how to pour a vodka and cranberry on the rocks. There were also people **yelling** in the hallway most of the time. It seemed more like a crack house then a hotel."

## DEFENDANTS FACILITATED AND HARBORED THE TRAFFICKING OF PLAINTIFF

120. Each Defendant is a signatory of the Code[21] and thereby has promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

121. Defendant Choice is a face and signatory to the ECPAT anti-trafficking knowledge,

guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

122.     Defendant Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

123.     Defendant Red Roof is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Red Roof publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Red Roof should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

124.     Defendants profited from the sex trafficking of Plaintiff Plaintiff Defendants rented rooms to and provided Wi-Fi to Plaintiff's trafficker when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where

---

[21] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

Plaintiff was trafficked. The hotel staff, especially front desk staff, at Defendants properties knew or should have known of the obvious signs of Plaintiff's trafficking.

125.     Defendants benefited from the steady stream of income that Plaintiff's trafficker and "johns" bring to their hotel brands. Defendants profited from each and every room that Plaintiff's trafficker and customers rented where Plaintiff was harbored and maintained for the

purpose of sex trafficking. In addition, Defendants profited from data collected each and every time Plaintiff's trafficker and customers used Defendants' Wi-Fi to advertise and solicit Plaintiff for commercial sex.

126. Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where Plaintiff was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

127. Moreover, Defendants repeatedly collected data on Plaintiff, her trafficker, and her "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of Plaintiff's trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Defendants would have taken proper measures, Defendants would not have profited from Plaintiff and other victims like her being trafficked at their locations.

128. Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where Plaintiff was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex

trafficking issues.

129. Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where Plaintiff was trafficked and reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

130. In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

131. Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

   a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

   b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

   c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

   d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

132. As a direct and proximate result of these egregious practices on the part of the Defendants, Plaintiff and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS

133. Upon information and belief, it is a standard practice in the hospitality industry, followed by both Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows

that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

134.     Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

135.     Defendants provide their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a substantial extent controlled by Defendants.[22] Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[23]

136.     Upon information and belief, Defendants require its branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

137.     Upon information and belief, per the relevant franchise agreements,[24] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

---

[22] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.
[23] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.
[24] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

138.	Choice exercises day-to-day control over Choice's Quality Inn & Suites Columbus and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Choice implements and retains brand hotel control over, including control over Choice's Quality Inn & Suites Columbus where Plaintiff was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

139.	Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a.	Requiring the branded locations to use Choice's property management system;

    b.	Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's centralized systems;

    c.	Requiring branded locations to keep audit reports and other records;

    d.	Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

    e.	Providing marketing requirements and standardized marketing services for the branded locations;

    f.	Regulating and monitoring the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

    g.	Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering and monitoring the branded hotel's compliance;

    h.	Requiring branded locations to install Choice's data transport system to share data with Choice corporate and monitoring the branded hotel's compliance;

    i.	Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission and monitoring the branded property's' compliance;

k. Regulating the rates for room rentals and monitoring compliance; and

l. Insurance coverage requirements and monitoring the requirements.[25]

140. Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice.[26]

141. Choice controls and monitors uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[27]

142. Choice mandates and monitors usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[28]

143. Choice controls and monitors all hotel reservations made across its branded

---

[25] See e.g. Comfort Inn 2020 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/comfort-inn-2020-fdd-franchise-information-costs-and-fees/
[26] *See* e.g. *Why Choice?,* CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). id. ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").
[27] *Id.*
[28] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about

locations on its centralized reservation system called Choice Edge.[29]

144. Through its national sales team, Choice controls and monitors the credit processing

system and the centralized direct billing at its brand hotels, including Choice's Quality Inn & Suites Columbus.[30]

145. Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[31]

146. Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

147. Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[32]

148. Choice requires and monitors branded properties' compliance with its corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law.[33]

**WYNDHAM**

149. Wyndham exercises day-to-day control over Wyndham's Super 8 Columbus and

---

[29] *Supra* n 101

[30] *Id.*

[31] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy

[32] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/ convert-a-hotel/#upscale (last visited Jun. 9, 2022).

[33] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham implements and retains brand hotel control over, including control over

Wyndham's Super 8 Columbus where Plaintiff was trafficked, as either direct subsidiaries or under the terms of its franchise agreements and monitors this compliance.

150.     Upon information and belief, Wyndham controls and monitors the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the branded locations to use Wyndham's property management system and monitoring compliance;

    b. Requiring branded locations to keep audit reports and other records and monitoring compliance;

    c. Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

    d. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Wyndham's centralized systems;

    e. Requiring the brands to regularly report data regarding customer feedback to Wyndham and monitoring compliance;

    f. Providing marketing requirements and standardized marketing services for the branded locations and monitoring compliance;

    g. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms and monitoring compliance;

    h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering and monitoring compliance;

    i. Providing training and orientation materials for branded property staff;

    j. Requiring branded locations to make modifications to the branded properties

upon Wyndham's request and to refrain from make substantial changes to the branded property without Wyndham's permission;

k. Requiring branded properties to comply with Wyndham's Human Rights Policy and other laws;

l. Regulating the rates for room rentals and monitoring compliance; and

m. Insurance coverage requirements and monitoring compliance.[34]

151. Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham.[35]

152. Wyndham controls and monitors uniform and required reservation, marketing, customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels.[36]

153. Through its national sales team, Wyndham controls the credit processing system and the centralized direct billing at its brand hotels, including the Wyndham's Super 8 Columbus

---

[34] *See e.g.* 2014 Franchise Disclosure Document https://fddexchange.com/wp-content/uploads/2014/03/Days-Inn-Franchise-Disclosure-Document-FDD-July-12-2012.pdf

[35] *Our Brands*, WYNDHAM HOTELS, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited Jun. 15 2022).

[36] *Benefits of Partnering with Wyndham Hotels & Resorts,* WYNDHAM HOTELS, CHOICE, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 15, 2022).

where Plaintiff was trafficked.[37]

154. Wyndham mandates branded properties source through Wyndham's global distribution system.[38] Wyndham mandates the use of specific vendors and suppliers for the

purchase of goods and services at its brand hotels, including Wyndham's Super 8 Columbus where Plaintiff was trafficked.[39]

155.     Wyndham regulates and monitors property rate, inventory availability, and overall revenue management for the branded locations by monitoring hotel booking data for trends and patterns.[40]

156.     Wyndham manages and monitors its branded properties through its Oracle Hospitality OPERA Cloud Property Management System.[41] Wyndham's Development and Sourcing teams negotiate contracts on behalf of brands for hotel infrastructure, operating supplies and equipment and food and beverage.[42]

157.     Wyndham sets, controls, and monitors Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including Wyndham's Super 8 Columbus where Plaintiff was trafficked.[43]

---

[37] *Id.*

[38] *Benefits of Partnering with Wyndham,* WYNDHAM, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 20, 2022).

[39] *See e.g., id* ("[Our goal is to ensure the design and construction of your hotel is as seamless as possible, guided by the appropriate brand standards.")

[40] Id.

[41] *Wyndham Implements Oracle Hospitality OPERA Cloud Property Management in its Full-Service Hotels,* HOTEL TECHNOLOGY NEWS (May 18, 2021), https://hoteltechnologynews.com/2021/05/wyndham-implements-oracle-hospitality-opera-cloud-property-management-in-its-full-service-hotels/

[42] *Supra* n 103

[43] *Leveraging technology to deliver an exceptional guest experience,* WYNDHAM (Summer 2021) 4, https://developmentsupport.wyndham.com/files/8516/2869/4484/Tech-Guide-Q3-2021.pdf

158.     Wyndham is the employer of the staff at its branded properties. For example, Wyndham posts all hotel jobs on its parent website.[44] Wyndham is also responsible for setting the core values and culture for all Wyndham employees.[45] In addition, Wyndham sets forth policies

for, and provides employee benefits.[46]

159.     Wyndham first adopted a Human Rights Statement in 2007. According to the updated 2018 policy, Wyndham promises to comply with human rights laws and standards and has "accountability mechanisms" in place to monitor and report on compliance. Brand locations are required to comply with human rights and "operating standards." Failure to comply can result in the termination of the franchise agreement.[47] Wyndham monitors its properties but fails to assess, train, and address human rights violations.

### RED ROOF

160.     Red Roof exercises day-to-day control over Red Roof's Red Roof Inn Columbus and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over Red Roof's Red Roof Inn Columbus, as either direct subsidiaries or under the terms of its franchise agreements.

161.     Red Roof controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts and monitors compliance, including but not limited to:

---

[44] *Join the Wyndham Family,* WYNDHAM, https://careers.wyndhamhotels.com/ (last visited Jun. 22, 2022)
[45] *About Wyndham,* WYNDHAM, https://careers.wyndhamhotels.com/content/About-Wyndham/#culture (last visited Jun 22, 2022)
[46] *Our Benefits,* WYNDHAM, https://careers.wyndhamhotels.com/content/Our-Benefits/?locale=en_US (last visited Jun 22, 2022)
[47] *Human Rights Statement*, http://q4live.s22.clientfiles.s3-website-us-east-1.amazonaws.com/153757806/files/doc_downloads/governance_documents/Wyndham-Hotel-Resorts-Human-Rights-Policy-Statement.pdf (last visited Jun. 15, 2022).

a. Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate and monitors compliance;

b. Providing reservation platforms where payment modes and suspicious reservations would suggest trafficking and monitors compliance;

c. Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

d. Providing and controlling customer review and response platforms and monitors compliance;

e. Monitoring customer reviews and response platforms;

f. Hosting and monitoring online bookings on Red Roof's domain;

g. Requiring the use of Red Roof's online bookings ;

h. Monitoring online bookings;

i. Requiring branded hotels to use Red Roof's customer rewards program;

j. Monitoring branded hotels to use Red Roof's customer rewards program;

k. Requiring branded hotels to use Red Roof's property management software;

l. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

m. Providing IT support for all property management systems, owned, operated, and required by Red Roof;

n. setting employee wages;

o. sharing profits;

p. standardizing training methods for employees;

q. building and maintaining the facility in a manner specified by the owner;

r. standardized or strict rules of operation;

s. regular inspection of the facility and operation by owner; and

t. fixing prices.[48]

162. Red Roof manages and monitors compliance of corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Red Roof.[49]

163. Red Roof controls and monitors compliance of uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including Red Roof's Red Roof Inn Columbus.[50] Red Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[51]

164. Red Roof requires its hotels to use a consolidated IT system and database for property management, credit processing and centralized billing, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated and monitors compliance. [52]

---

[48] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf
[49] *See e.g.*, *Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training. On everything from helping with pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")
[50] *Id.*
[51] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")
[52] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology; *See also Sales Team,* RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9, 27 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars, and in-person visits"

165.     Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.[53] Red Roof's privacy policy states that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[54] Red Roof monitors this technology.

166.     Red Roof also sets, controls, and monitors Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Red Roof's Red Roof Inn Columbus.[55]

167.     In addition, through an integrated corporate marketplace, Red Roof mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including Red Roof's Red Roof Inn Columbus and monitors compliance.[56]

168.     Under the guise of maintaining its "brand standards," Red Roof forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and

---

alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).

[53] *Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).

[54] *Id.*

[55] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/

[56] See *Operational Support Procurement Services*, RED ROOF, https://www.redrooffranchising. com/operational-support (last visited Jun. 6, 2022).

exorbitant requirements.[57]

169.     Red Roof posts job openings for its branded properties on its central career positing website.[58] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[59]

## DJKS

170.     DJKS facilitated the exploitation of A.M.H. at Columbus RRI when it continued to provide rooms where A.M.H. was imprisoned and exploited despite actual knowledge of or willful blindness to the fact that A.M.H. was being trafficked at Columbus RRI.

171.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at Columbus RRI, DJKS continued renting rooms to be used in sex trafficking, providing traffickers with a safe haven, and operating DJKS RRI in a way that enabled and facilitated sex trafficking activity.

172.      DJKS knew or should have known about the activity that resulted in A.M.H. being trafficked.

173.     DJKS facilitated widespread trafficking at Columbus RRI, and Red Roof also facilitated widespread trafficking at Columbus RRI, including the trafficking of A.M.H., in ways including, on information and belief:

    a.     developing relationships with multiple traffickers, including Plaintiff's trafficker, and creating an understanding that this trafficker could operate at the hotel without risk of interference;

    b.     continuing to provide rooms, services, and assistance to traffickers in the

---

[57] *See Design and Construction,* RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).
[58] *See* https://www.redroofjobs.com/
[59] *Id.*

face of obvious "red flags" of trafficking of Plaintiff and other victims;

c. accommodating specific requests made by traffickers;

d. serving as lookouts for traffickers;

e. leaving doors unlocked or ajar for the benefit of the traffickers;

f. providing traffickers with master keys or keys to external building doors;

g. accepting bribes from the traffickers;

h. allowing traffickers to check in without showing identification;

i. observing Plaintiff and other victims in obvious distress but continuing to provide support to her trafficker;

j. allowing "johns" who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

k. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

l. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

m. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

n. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources

to avoid detection or interference by hotel staff.

174.    DJKS' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Plaintiff.

175.    DJKS knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue and other benefits by facilitating that trafficking.

## GAJANAND

176.    Gajanand facilitated the exploitation of A.M.H. at Columbus RRI when it continued to provide rooms where A.M.H. was imprisoned and exploited despite actual knowledge of or willful blindness to the fact that A.M.H. was being trafficked at Columbus RRI.

177.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at Columbus RRI, Gajanand continued renting rooms to be used in sex trafficking, providing traffickers with a safe haven, and operating Gajanand RRI in a way that enabled and facilitated sex trafficking activity.

178.    Gajanand knew or should have known about the activity that resulted in A.M.H. being trafficked.

179.    Gajanand facilitated widespread trafficking at Columbus RRI, and Red Roof also facilitated widespread trafficking at Columbus RRI, including the trafficking of A.M.H., in ways including, on information and belief:

> o.    developing relationships with multiple traffickers, including Plaintiff's trafficker, and creating an understanding that this trafficker could operate at the hotel without risk of interference;

> p.    continuing to provide rooms, services, and assistance to traffickers in the

face of obvious "red flags" of trafficking of Plaintiff and other victims;

q. accommodating specific requests made by traffickers;

r. serving as lookouts for traffickers;

s. leaving doors unlocked or ajar for the benefit of the traffickers;

t. providing traffickers with master keys or keys to external building doors;

u. accepting bribes from the traffickers;

v. allowing traffickers to check in without showing identification;

w. observing Plaintiff and other victims in obvious distress but continuing to provide support to her trafficker;

x. allowing "johns" who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

y. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

z. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

aa. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

bb. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources

to avoid detection or interference by hotel staff.

180. Gajanand's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Plaintiff.

181. Gajanand knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue and other benefits by facilitating that trafficking.

**G6**

182. G6 exercises day-to-day control over G6's Motel 6 Columbus North and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over G6's Motel 6 Columbus North, as either direct subsidiaries or under the terms of its franchise agreements.

183. Upon information and belief, G6 controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a. Requiring the branded locations to use G6's centralized property management, data management, and reservation and billing systems;

b. Gathering reports of data generated by branded locations including guest information, reservation, payment, and occupancy information through G6's centralized systems;

c. Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

d. Requiring brands to purchase products through G6's e-procurement marketplace system or from approved suppliers;

e. Requiring branded properties to pay fees based of the percentage of gross room revenues;

f. Providing advertising requirements and standardized marketing services for the branded locations;

g. Requiring branded hotels to use approved vendors for internet services or other requirements for cybersecurity and technology;

h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

i. Regulating employment policies at branded location including training and orientation materials for staff;

j. Requiring branded locations to make modifications to the branded properties upon G6's request and to refrain from make substantial changes to the branded property without G6's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.[60]

184. G6 jointly employs all staff located at G6's Motel 6 Columbus North the Motel 6 by G6 where A.M.H was trafficked.

185. G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by G6.

---

[60] *See e.g.* 2017 Motel 6 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/motel-6-2017-fdd-summary/motel-6-2017-fdd/

186.     G6 controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.[61]

187.     G6 requires branded properties to use a centralized, cloud-based reservation and property management system.[62]

188.     G6 gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[63]

189.     G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives G6 the ability to access, monitor, and harvest that internet data.[64]

190.     G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.[65]

## BEST WESTERN

191.     Upon information and belief, it is a standard practice in the hospitality industry, followed by all Hotel Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows

---

[61] G6 offers a centralized reservations system on its website, a customer support channel, and press releases and announcements about the Motel 6 brand through g6hospitality.com; G6 also offers a reward program specific to the Motel 6 brand. *See Join My6,* MOTEL 6, https://www.motel6.com/en/home/my6/join.html

[62] *See* Michal Christine Escobar, *2020 Enterprise Innovator: Motel 6,* HOSPITALITY TECHNOLOGY, https://hospitalitytech.com/2020-enterprise-innovator-motel-6

[63] G6 Hospitality. *Privacy Policy,* https://www.motel6.com/en/home/policies/privacy-policy.html

[64] Motel 6, *Web and Mobile Ethical Vulnerability Disclosure Policy,* https://www.motel6.com/en/home/policies/vulnerability-disclosure.html

[65] *Combatting Human Trafficking,* G6 HOSPITALITY, https://g6hospitality.com/about-us/combating-human-trafficking/

that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

192. Best Western provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

193. Defendants provide their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a large extent controlled by the Hotel Defendants.

194. Upon information and belief, per the relevant franchise agreements, the Hotel Defendants may enforce their brand standards by means of periodic inspections of hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

195. Upon information and belief, the Hotel Defendants' brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

196. It is further a standard practice in the hospitality industry, upon information and belief, followed by all Hotel Defendants, for parent companies to exercise significant control over the employment decisions of their hotel locations.

197. The Hotel Defendants and their hotel locations exhibit a significant degree of interrelated, intermingled, and unified operations at the locations at which Plaintiff was trafficked. On information and belief, the Hotel Defendants promulgate policies, procedures, and standards

governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which Plaintiff was trafficked.

198. Under federal labor regulations, the Hotel Defendants are each considered joint employers of the employees at their locations at which Plaintiff was trafficked.

199. Specifically, the Hotel Defendants create and promulgate policies relating to training employees to recognize and respond to human trafficking, and the Hotel Defendants determine whether or not such training shall be mandatory.

200. Despite their knowledge that few, if any, employees at their hotel locations actually receive trainings if the same are not mandated, the Hotel Defendants have failed to mandate such training on any significant scale or at the specific locations where Plaintiff was trafficked.

201. On information and belief, the Hotel Defendants require their hotel locations to pay around 10% of gross revenue back to the Hotel Defendants for the privilege of using the Hotel Defendants' names and following their brand standards.

## TOLLING OF LIMITATIONS

202. To the extent that Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time she was harmed and through the end of her trafficking, she was under the coercion and control of her traffickers who drugged her, threatened her, psychologically abused her, exercised coercive control over her, and severely restricted her freedom. As a result, Plaintiff lacked the information and capacity to understand her injuries and their legal causes.

203. At the time Plaintiff was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at Defendants' hotels or that she was a person "trafficked," much less that she was the "victim" of a legal venture involving

defendants, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

204. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Plaintiff faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Plaintiff filed this lawsuit.

205. While under the control of her traffickers through at least 2017, Plaintiff did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Plaintiff could not have pursued her claims while under the active control of her traffickers despite the exercise of ordinary diligence.

206. To the extent Defendants assert an affirmative defense of limitations, Plaintiff also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

207. Plaintiff was subject to continuous trafficking at Defendants' hotels through at least 2017, which is not more than 10 years before Plaintiff filed this lawsuit.

208. This continuous trafficking resulted from Defendants' facilitation of trafficking at the subject properties and Defendants' ongoing ventures with one another and with criminal traffickers at those hotel/motel properties.

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

209. Plaintiff incorporates each foregoing allegation.

210. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

66

211.     Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion.

212.     Defendants have benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff when they knew or should have known violations of §1591(a) were occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for" and proximate cause of Plaintiff's injuries and damages.

213.     Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.     Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

67

b.  Disgorgement of profits obtained through unjust enrichment;

c.  Restitution;

d.  Statutory and/or treble damages, where available;

e.  Punitive damages;

f.  Attorneys' fees and expenses;

g.  The costs of this action;

h.  Pre- and post-judgment interest; and

i.  Any other relief the Court or jury deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.

Dated: April 22, 2026

Respectfully submitted,

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (0093584)
Penny L. Barrick (0074110)
Babin Law, LLC
10 West Broad Street, Suite 900
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com
penny.barrick@babinlaws.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 22, 2026, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's case management and electronic filing system. Parties may access this filing through the Court's case management and electronic filing system.

Respectfully Submitted,

*/s/ Penny L. Barrick.*
Penny L. Barrick